**POPPLEWELL et al. v. FLANAGAN et al.**

Court of Appeals of Kentucky.

Dec. 14, 1951.

446

L. C. Lawrence, J. N. Buster, Jamestown, for appellant.

Wm. J. Chumbley, Jamestown, for appellee.

CULLEN, Commissioner.

J. S. Popplewell died intestate on September 20, 1947. He left surviving him his widow, Eliza, age 64; a married daughter, Orpha Flanagan, age 41; a son, Finis, age 35; an unmarried daughter, Mary, age 29; and two grandchildren, ages 15 and 17, by a deceased daughter, Olza Wilson, who had died in 1930. Orpha and the two grandchildren brought this action against Eliza, Finis and Mary, seeking to charge, as advancements against Finis and Mary, the value of certain real estate conveyed to them by their father prior to his death, and the amount of a check given to Mary by the father shortly before his death. The plaintiffs also sought a sale of the real estate owned by the father at the time of his death, and a division of the proceeds in which the advancements would be charged against the shares of Finis and Mary.

The chancellor adjudged that the lands conveyed to Finis and Mary constituted advancements to them, and that the value of the advancement to each of them, at the time it was made, was $3,500. The check given to Mary was not adjudged to be an advancement. The judgment ordered a sale of the land owned by J. S. Popplewell at the time of his death, and directed that Finis and Mary should not share in the proceeds thereof, or in any other portion of the estate, until Orpha and the two grandchildren (jointly) had received $3,500 each.

Finis and Mary have appealed, contending that the advancements erroneously were charged against them. Orpha and the grandchildren have cross-appealed, claiming that the advancements were valued too low, and that the amount of the check should have been charged against Mary.

The evidence shows that J. S. Popplewell was the owner of four tracts of land, in Russell County, which for convenience we will call the Home Farm, Ridge Farm No. 1, Ridge Farm No. 2, and the Creek Farm. In June 1946, about 15 months before his death, he discussed with his three children a plan for partial distribution of his estate, which involved deeding a tract of land to each of the children, subject to certain reservations and charges. The children agreed to the general plan. The father then had the land surveyed and made the following specific proposal:

1. Mary to be deeded the Home Farm, subject to a life estate in favor of the parents.

2. Finis to be deeded Ridge Farm No. 1, subject to the right of the parents, during their lives, to receive one-fifth of the tobacco and one-fourth of the other products of the farm; also, Finis to pay $500 to one of the grandchildren.

3. Orpha to be deeded Ridge Farm No. 2, with the same reservation in favor of the parents as in the deed to Finis, and she to pay $500 to the other grandchild. Upon learning what her share was proposed to be, Orpha refused to accept the proposal. The father then, on June 15, 1946, deeded the Home Farm to Mary, and the Ridge Farm No. 1 to Finis, on the proposed terms. At the time of the father's death in September 1947, he remained the owner of Ridge Farm No. 2 and the Creek Farm.

Mary had always lived at home, and following the father's death she and her mother continued to live on the Home Farm, the mother receiving all of the income from that farm. Upon the trial of this action, in 1950, Finis testified that during the four years since the Ridge Farm No. 1 was deeded to him, he had paid an average of $300 per year to his parents (the first payment being to the father and the subsequent ones to the mother) in compliance with the agreement that they were to receive a portion of the income of his farm. However, he had not paid the $500 to the grandchild, as contemplated by the original proposal, it appearing that the requirement that this sum be paid was abandoned when Orpha refused to participate in the plan.

Employing some kind of mathematical sleight-of-hand, Finis argues that because he must pay a portion of the income of his farm to his mother during the 13 years (he says) of her life expectancy, and because such portion has averaged $300 per year, there is a charge on his farm equal to $4,000, which is more than the value of the farm, with the result that he received nothing by the gift of the farm to him. Finis overlooks the fact that during the period his mother would receive $4,000 out of the proceeds from the farm, he would receive at least $12,000 from the same source; so if his line of reasoning is to be followed, the gift of the farm was worth $12,000 to him. Obviously this line of reasoning is fallacious.

■■ The testimony as to the value of the farm received by Finis, as of June 15, 1946, ranged from $3,500 to $6,000. Since Finis acquired the right of possession and use of the farm on that day, the value of the advancement to him must be determined by ascertaining the value of the farm as of that day, and subtracting the value of the right reserved by the parents to receive a portion of the products of the farm during their lives. KRS 391.140. This determination necessarily can be nothing more than an approximation, because it involves life expectancies, and a reservation of a portion of the products of the farm which cannot be valued with any degree of certainty. However, a practicable administration of the law would seem to require that an effort be made to place a value on the advancement now, rather than wait until the death of the mother. Gossage v. Gossage's Adm'r, 281 Ky. 575, 136 S.W.2d 775.

■ The record does not show the age of J. S. Popplewell at the time of the conveyance to Finis, but it is clear that he was an elderly man. Mrs. Popplewell was 63 at that time, and since her husband died within 15 months after the conveyance, we think it will be reasonable to use her life expectancy as the basis for valuing the reserved interest in the products of the farm.

According to the Dublin and Lotka Life Expectancy Table, page 2908, Kentucky Revised Statutes, 1948 Edition, Mrs. Popplewell's life expectancy was 12.93 years. According to the U. S. Life Table, page 2907, Kentucky Revised Statutes, 1948 Edition, the present value of an income of $1 per year, at four percent, for the life of a person aged 63, is $8.95 (8.94964).

Since the reservation was of a portion of the "products" of the farm, instead of a portion of the "income," it will be necessary to translate the reservation into terms of income before the present value of the reservation can be determined. Taking the position most favorable to Finis, it might be assumed that the reservation of one-fifth of the tobacco and one-fourth of the other products was equivalent to a reservation of the entire profits or net income of the farm. This would be the same as if Mrs. Popplewell had a life estate in the entire farm. If the value of the farm, at the time it was conveyed to Finis, should be fixed at $5,000 (which would be justified by the evidence), the value of the life estate would be $1,790 ($5,000 times 4%, times 8.95), and the value of the advancement would be $3,210.

Using another approach, it might be assumed (1) that the average of $300 per year which Finis paid to his parents during the years 1946 to 1950 would continue during his mother's life to represent the yearly value of the reserved share of the products; (2) that this sum would represent the entire profit from the farm; and (3) that the profits would amount to a five-percent return on the investment. On this basis, the value of the farm would be $6,000 (income capitalized at five percent); the value of the reservation would be $2,685 ($300 times 8.95); and the value of the advancement would be $3,315.

The judgment of the lower court does not show upon what basis the chancellor arrived at a value of $3,500 for the advancement to Finis. In view of the evidence upon which the chancellor could have fixed the value of the farm as high as $6,000, and in view of the absence of any absolute formula for determining the value of the reservation in favor of Mrs. Popplewell, we cannot say that the chancellor erred in his valuation of the advancement.

It certainly is to the benefit of all the heirs that the settlement and distribution of the estate not be postponed until the death of the widow, and we therefore are of the opinion that practical justice is better served by an attempt to place a present value on the advancement to Finis, even though the value may be no more than a very rough approximation.

With respect to the farm advanced to Mary, the evidence as to its value, as of the date of the deed, varied from $2500 to $6000. The court should have directed the evidence to the question of value on the date of Mr. Popplewell's death, under the rule laid down in Gossage v. Gossage's Adm'r, 281 Ky. 575, 136 S.W.2d 775, because Mary's interest in the farm was subject to the life estate of her mother. However, we thing that no material error was done, because there was only a period of 15 months between the date of the deed and Mr. Popplewell's death, during which period there could have been no substantial change in the value of the farm.

Under the Gossage case, the court should have fixed a value on the farm given to Mary, determined the value of the mother's life estate according to the life expectancy and annuity tables, based upon the mother's age at the time of the father's death (64 years), and subtracted the latter from the former to reach the value of the advancement. On this basis, if the value of the farm was $5,000, the life estate was worth $1,725, and the advancement amounted to $3,275. Since this, again, involves estimates and approximations, we believe the chancellor was substantially correct in fixing the value of Mary's advancement at $3,500.

Mary argues that the farm deeded to her was worth only $2,500, the widow's life estate was worth $2,049, and her advancement therefore amounted only to $451. We are at a loss to determine what formula was used in arriving at the conclusion that a life estate for 12 or 13 years is worth four-fifths of the value of the corpus.

450

Some argument is made about money and personal property given to each of the children when they married. These gifts clearly were not made with any "view to a portion or settlement in life" KRS 391.-140, and in any event it appears that each child received about the same amount.

Finis and Mary contend that a sum of $210 paid by their father towards a hospital bill of their sister Olza, around 1930, should be charged against Olza's children. They also contend that the children should be charged with the value of the maintenance furnished by the grandparents to one of the children during a period of nine years following Olza's death, when the child lived in the home of the grandparents.

There is nothing to indicate that the payment towards the hospital bill was anything more than the normal action a parent would take to help a child in trouble. We think it is comparable to the payment of the attorney fees of a child accused of crime, which has been held not to be an advancement. Chism v. Chism, 296 Ky. 73, 176 S. W.2d 101.

With respect to the maintenance furnished the grandchild, the statute expressly declares that maintenance or education furnished to a grandchild, without any view to a portion or settlement in life, shall not be deemed an advancement. There is no evidence that Mr. Popplewell, during the period the grandchild was in his home, had any intention of charging the cost of maintenance against the grandchild's share of his estate.

Finis and Mary suggest that Orpha is estopped from seeking to charge advancements against them, because she originally agreed to the father's plan for distribution of his estate. None of the necessary elements of estoppel exist in this case. Besides, it is clear that Orpha never agreed to the specific plan for distribution.

Underlying all of the contentions of Finis and Mary there is the basic idea that the father thought he was making a fair and equitable distribution of his estate, and that Orpha and the grandchildren, by receiving their normal shares in the two farms he owned at his death, would be treated justly. The evidence does indicate that the father had that idea. However, it is obvious that he was taking into consideration a number of intangible factors, such as the degrees of devotion and faithfulness of the children, the fact that Mary was unmarried and had remained at home, the fact that Finis had helped his father in the farm operations, and similar considerations. If the father had made the distribution of his estate by a will, no question could have been raised as to the fairness of the distribution. But the advancement statute requires a strict financial equality as to undevised property, without regard to intangible factors. Edwards v. Livesay, 203 Ky. 53, 261 S.W. 839. The object of the statute is to procure equality in the distribution of undevised estates. Gossage v. Gossage's Adm'r, 281 Ky. 575, 136 S.W.2d 775.

Having considered the arguments advanced by the appellants, it is our opinion that the judgment should be affirmed on the direct appeal.

On cross-appeal, Orpha and the grandchildren do not seriously contend that the advancements of the farms to Finis and Mary were valued too low. Their main contention is that the check for $500, given to Mary by her father shortly before his death, should have been charged as an advancement to Mary. Mary's testimony concerning the check is as follows:

"Q. Did your father give you anything else? A. He gave me $500.

"Q. Do you know why he did that? A. He said I had been so much help around there and to equal it with their shares.

* * * * * *

"Q. Your father gave you $500, didn't he? A. That was to even up with the land that he had given Orpha and Finis."

This testimony clearly puts the check in the class of an advancement. Mary argues that because the check was presented to and paid by the administrator, after the father's death, and was credited to the administrator in the settlement of his accounts, the transaction must be treated as one for payment of a debt. That argu-

ment is without merit. We think the check must be charged against Mary.

The judgment is affirmed on the direct appeal, and reversed on the cross-appeal, with directions to enter judgment charging the $500 check as an advancement against Mary.